**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE: DELPHI CORPORATION      MDL No. 1725
SECURITIES, DERIVATIVE &      Master Case No. 05-md-1725
"ERISA" LITIGATION,      Hon. Gerald E. Rosen
_____/      ALL CASES

**AMENDED OPINION AND ORDER[1] REGARDING LEAD PLAINTIFFS'**
**MOTIONS FOR (1) FINAL APPROVAL OF SETTLEMENTS, (2)**
**SETTLEMENT CLASS CERTIFICATION, (3) FINAL APPROVAL OF PLANS**
**OF ALLOCATION, AND (4) AWARD OF ATTORNEYS' FEES; AND**
**DELPHI TRUST I INTERIM COUNSEL'S MOTION FOR ATTORNEYS' FEES**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____January 11, 2008_____

PRESENT: Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

On November 13, 2007, the Court conducted a hearing on Plaintiffs' Motions for

Final Approval of Settlements, Settlement Class Certification, Final Approval of Plans of

Allocation and for the Award of Attorneys' Fees in the above-captioned multi-district

action.[2] At this hearing, the Court heard not only the oral arguments of counsel but also

_____

[1] The Court is filing this Amended Opinion and Order pursuant to Fed. R. Civ. P. 60(a) to correct a few clerical mistakes noted in the Opinion and Order as originally filed on January 10, 2008.

[2] The Court had previously given its preliminary approval to the proposed securities fraud settlement and ERISA partial settlement and had provisionally certified

1

the statements and objections of certain class members and interested parties, and Lead Plaintiffs' and Defendants' responses thereto. The Court also heard argument on the separate Motion of the Delphi Trust I Interim Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses.

Following the hearing, the Court ordered supplemental briefing on the fee request of the Delphi Trust I attorneys. The Court also conducted a second hearing, on December 4, 2007, concerning the securities fraud settlement and the parties' post-November 13 agreement to modify the terms of the settlement with regard to the consideration to be provided to the Securities Fraud Settlement Class by Delphi.[3]

Having reviewed and considered all of the briefs, written statements, objections, memoranda of law and supporting documents filed with the Court, and having further considered the oral arguments, testimony and statements made on the record on November 13 and December 4, 2007, the Court is now prepared to rule on the Motions for final settlement approval, final settlement class certification, and final plans of allocation, and on the Motions and applications for attorneys' fees and expenses. This

---

the securities fraud and ERISA classes on September 5, 2007. It also approved dissemination of notice to class members on that date.

[3]    After hearing the oral arguments of counsel and the statements on the record of two of the four Lead Plaintiffs on December 4, the Court tentatively approved these modifications and ordered dissemination of supplemental notice of them to the class members. The Court has received verification of the publication of the supplemental notice as ordered. The notice directed that any objections to the modification be filed by January 4, 2007. As of this date, no objections have been filed.

Opinion and Order sets forth the Court's rulings on these matters.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Delphi Corporation, once a completely integrated division of General Motors, was established as an independent company in 1999. At the time of its spin-off from GM, Delphi was the largest supplier of automotive parts in the world. The new company enjoyed a healthy balance sheet in 1999 as a result of the stock market riding the telecom and internet high and the economy being strong at the time. The company's fiscal success was also attributable to the demand for GM's (Delphi's primary customer's) high profile SUVs and because its pension plans were being largely funded by the soaring stock market.

In 2000, however, the stock market collapse precipitated a downturn in the economy. This, in turn, led to a decline in the production of cars by GM. The decline in auto production widely impacted the various businesses that support domestic automobile manufacturers, including auto parts suppliers. Nonetheless, despite the collapsing economy, Delphi continued to report profits in its SEC Form 10-Q quarterly reports, its annual Form 10-K's, and in press releases to the general public.

However, in July 2004, the credibility of Delphi's financial statements was called into question when the SEC launched an investigation into certain transactions between Delphi and one of its information technology suppliers, EDS. This SEC investigation precipitated an internal investigation by Delphi's Audit Committee which was begun in

October 2004.

The six-month long internal investigation revealed accounting improprieties dating back to Delphi's birth as an independent publicly traded company. The findings of the investigation were made public on March 3, 2005, and Delphi's investors were warned that the company's financial statements for 2001 and beyond were unreliable.

Following that announcement, on March 5, 2005, Delphi's debt rating was downgraded to junk status. The revelation that Delphi had inflated its earnings and operating cash flow since 1999 also sent Delphi's stock plummeting – Delphi's stock price fell from $6.48 on March 3 to $5.15 on March 7 – a drop of over 20% in two trading days. Then, on March 30, 2005, the FBI announced that it was initiating a criminal investigation into Delphi's accounting.

Within days of Delphi's announcement of the findings of its internal investigation, Delphi investors commenced litigation under the PSLRA. The first Delphi securities fraud class action complaint was filed in Southern District of New York on March 7, 2005. Six more securities fraud complaints were filed in the Southern District of New York on March 8, 10, 15, 29, April 1 and May 6, 2005. These complaints were subsequently consolidated and collectively re-titled "*In re Delphi Corp. Securities Litigation.*"[4] Thereafter, on September 30, 2005, the Lead Plaintiffs filed a Consolidated Class Action Securities Fraud Complaint against Delphi, certain officers and directors,

_____

[4] Additional securities fraud actions were also filed in the Southern District of Florida and the Eastern District of Michigan.

Delphi's auditors and underwriters, and several outside parties.

In the meantime, while the securities fraud litigation was proceeding in the Southern District of New York, a number of participants in Delphi's various retirement plans filed ERISA actions here in the Eastern District of Michigan alleging that Delphi's pension and retirement plans were damaged as the result of the company's accounting improprieties and other misconduct which caused the company's stock to be inflated and, consequently, a highly imprudent investment for retirement savings. (The plans' assets were heavily invested in Delphi stock.)

Shortly after the initiation of these securities fraud and ERISA actions, on October 8, 2005, Delphi and substantially all of its active U.S. subsidiaries, filed for Chapter 11 bankruptcy.

Thereafter, on December 12, 2005, the Judicial Panel on Multi-District Litigation ordered that the 24 Delphi securities fraud, ERISA and shareholders' derivative actions filed in the Southern District of New York, the Eastern District of Michigan and the Southern District of Florida be transferred to this Court for coordinated/consolidated pretrial proceedings.

Following transfer to this Court, motions to dismiss both the ERISA and the securities fraud consolidated complaints were filed and extensively briefed by the parties. However, before any hearings on the dispositive motions were scheduled, the parties requested leave to pursue facilitation before the Honorable Layn R. Phillips, former

United States District Judge for the Western District of Oklahoma. The Court approved

the request and appointed Judge Phillips as Special Master for settlement purposes.

Following intensive written and face-to-face negotiations facilitated by Judge Phillips in

New York and Detroit in July and August 2007 partial settlements were reached in both

the securities fraud and ERISA actions.[5]

III. THE SECURITIES FRAUD SETTLEMENT AND PLAN OF ALLOCATION

The Settlement Agreement agreed upon by the Securities Fraud Lead Plaintiffs

and Settling Defendants Delphi Corporation, Delphi Trust I and Delphi Trust II; Delphi

Officers and Directors J.T. Battenberg III, John G. Blahnik, Robert H. Brust, Virgis W.

Colbert, Alan S. Dawes, David N. Farr, Paul R. Free, Bernd Gottschalk, Susan A.

McLaughlin, Oscar de Paula Bernades Neto, Cynthia A. Niekamp, John D. Opie, Roger

S. Penske, Donald L. Runkle, John D. Sheehan and Patricia C. Sueltz; and Banc of

America Securities, LLC, Barclays Capital Inc., Bear, Stearns & Co., Citigroup Global

Markets, Credit Suisse Securities (USA) LLC, Merrill, Lynch, Pierce, Fenner & Smith

Inc., Morgan Stanley & Co. Inc., UBS Securities LLC, and Wachovia Capital Markets,

---

[5] The partial settlement reached in the securities fraud action did not resolve the Plaintiffs' claims against Delphi's former auditor, Deloitte & Touche LLP and three entities alleged by Lead Plaintiffs to have engaged in deceptive and fraudulent transactions with Delphi, namely, JPMorgan Chase & Co (as successor-in-interest to Bank One Corp.), SETECH, Inc., and BBK, Ltd. The settlement reached in the ERISA action excludes Plaintiffs' claims against State Street Bank. The Plaintiffs continue to litigate their claims against these Non-Settling Defendants, although the Court has been advised that a tentative settlement has been reached between Plaintiffs and Deloitte & Touche. If and when that settlement is finalized, the Court will address it separately.

LLC (collectively, the "Underwriter Defendants") calls for a settlement of all claims

against these Defendants and provides for a recovery with a potential value of

$284,100,000, comprised of the following payments made by or on behalf of the Settling

Defendants:

> (i) $88,600,000[6] in cash paid by Delphi's insurance carriers on behalf of the Delphi Officer and Director Defendants;

> (ii) $1,500,000 in cash paid by or on behalf of certain of the Underwriter Defendants;

> (iii) $15,000,000 in cash paid by Delphi; and

> (iv) an allowed claim in Delphi's Bankruptcy action that will be paid in Delphi Plan Currency[7] pursuant to Delphi's Plan of Reorganization with a potential value of $179,000,000, along with Delphi's agreement to finance, at no cost to the Class, the cash payment necessary to exercise some or all of the Discount Rights until after the Effective Date of the Settlement, thereby permitting the Class to realize some or all of the potential value of the Discount Rights without incurring significant additional cost.[8]

---

[6] This figure includes the $10,000,000 designated as a "contingent" payment that was held in reserve for defense costs for the Director and Officer Defendants in the event that the Justice Department decided to proceed with criminal prosecution of any of them. Since the date of the fairness hearing, however, the Court and the parties have been advised by the Justice Department that it is not going to proceed with prosecution of any of the Director or Officer Defendants. Because there is one other pending investigation, however, these funds remain contingent and the Special Master will determine when -- and what percentage of the funds -- will be available for distribution to the Class.

[7] Under the Delphi Plan of Reorganization, "Delphi Plan Currency" is comprised of stock in the reorganized Delphi Corporation and the right to purchase additional stock in the reorganized Delphi at a discount ("Discount Rights").

[8] As originally presented to the Court for final approval on November 13, 2007, Delphi's share of the settlement consisted solely of an allowed claim in Delphi's bankruptcy to be paid in Delphi Plan Currency valued at $204,000,000. It was this aspect

These cash amounts, plus interest, plus the other forms of Delphi Consideration, comprise the "Gross Settlement Fund."  The insurance payments and the $1.5 million in cash paid by the Underwriter Defendants have been deposited into an escrow account, and since deposited, has been earning interest.  The remaining consideration will be contributed upon the Effective Date of Delphi's Plan of Reorganization.  After the Bankruptcy Court's final approval and confirmation and the occurrence of the Effective Date of the Plan of Reorganization, the Settlement proceeds, less the costs of notice and administration of the Settlement and the payment of attorneys' fees and costs,[9] the Net Settlement proceeds will be distributed to class members pursuant to a "Plan of Allocation."

Pursuant to the Settlement Agreement, persons who purchased or acquired

_____

of the terms of the settlement that was the subject of the Settlement Modification Hearing on December 4th.  Pursuant to the modification, the $204,000,000 Delphi Plan Currency payment was reduced to $179,000,000.  To make up for the $25 million shortfall, Delphi agreed to an additional cash payment of $15,000,000 and also agreed to finance, at no cost to the Class, the cash payment necessary for Plaintiffs to exercise some or all of the potential value of Discount Rights until after the Effective Date of the Settlement.

As noted, the Court conducted a hearing on the proposed modification, and two of the Lead Plaintiffs and Lead Plaintiffs' Counsel all indicated that they believe that the economic benefit of the additional cash and financing for Discount Rights provided by Delphi are at least equivalent to the amount of the reduction of the allowed claim and may, in fact, provide a greater benefit to the Class because it permits the Class to obtain some or all of the Discount Rights Offering at no additional cost.

[9]  The Securities Lead Plaintiffs' counsel have requested that they be awarded 18% of the Gross Settlement Fund to cover their fees and $1,300,000 for their costs and expenses.  Attorneys fees and costs are addressed in Section VII of this Opinion.

publicly traded securities of Delphi, including securities issued by Delphi Trust I and Delphi Trust II, between March 7, 2000 and March 3, 2005, inclusive, and who suffered losses, may be entitled to a pro rata share in the net settlement according to an agreed-upon "Plan of Allocation." The parties' proposed Plan of Allocation is not a formal damage analysis. Rather, the Plan of Allocation for the Securities Fraud Settlement reflects the Plaintiffs' allegations that the price of Delphi stock was artificially inflated during the Class Period due to misrepresentations and/or omissions regarding Delphi's earnings. The Plaintiffs allege that corrective disclosures on July 17, 2002, June 13, 2003, March 4, 2005 and March 7, 2005 removed artificial inflation from the price of Delphi stock. Thus, in order to be recognized for recovery in the Settlement, a Delphi security must have been held past the date of a corrective disclosure. In other words, a Delphi security acquired during the Class Period from March 7, 2000 through July 16, 2002, must have been held until or beyond July 17, 2002, the first trading day after the first corrective disclosure. Similarly, a Delphi security acquired on or after July 17, 2002 must have been held until June 13, 2003, the day of the second corrective disclosure, and Delphi securities acquired on or after June 13, 2003 must have been held until March 4, 2005, the last day of the Class Period.

The Plan of Allocation provides for the distribution of the Net Settlement Fund to Authorized Claimants who submit to the Claims Administrator a proper Proof of Claim. Each Authorized Claimant's pro rata share of the Net Settlement will be based upon the

claimant's "Recognized Claim." The Plan calls for calculation of Recognized Claims for

the purposes of the Settlement as follows:

Common Stock Purchases

1.    For shares of Delphi common stock purchased between March 7, 2000 and
      July 16, 2002, inclusive and:

      a.    Sold on or before the close of trading on July 16, 2002, an
            authorized claimant's Recognized Claim is "zero."

      b.    Sold at a loss between July 17, 2002, and June 12, 2003, an
            authorized claimant's Recognized Claim is the lesser of: (i)
            the purchase price minus the sales price; or (ii) $0.84 per
            share.

      c.    Sold at a loss between June 13, 2004 and March 3, 2005, an
            authorized claimant's Recognized Claim is the lesser of: (i)
            the purchase price minus the sales price; or (ii) $1.55 per
            share.

      d.    Held as of the close of business on March 3, 2005, an
            authorized claimant's Recognized Claim is the lesser of: (i)
            the purchase price minus $5.15 or (ii) $2.73 per share.

2.    For shares of Delphi common stock purchased between July 17 2002 and
      June 12, 2003, inclusive, and:

      a.    Sold on or before the close of trading on June 12, 2003, an
            authorized claimant's Recognized Claim is "zero."

      b.    Sold at a loss between June 13, 2003, and March 3, 2005, an
            authorized claimant's Recognized Claim is the lesser of: (i)
            the purchase price minus the sales price; or (ii) $0.71 per
            share.

      c.    Held as of the close of business on March 3, 2005, an
            authorized claimant's Recognized Claim is the lesser of: (i)
            the purchase price minus $5.15; or (ii) $1.89 per share.

3.   For shares of Delphi common stock purchased between June 13, 2003 and March 3, 2005, inclusive, and:

    a.   Sold on or before the close of trading on March 3, 2005, an authorized claimant's Recognized Claim is "zero."

    b.   Held as of the close of business on March 3, 2005, an authorized claimant's Recognized Claim is the lesser of: (i) the purchase price minus $5.15 or (ii) $1.18 per share.

Note and Preferred Security Purchases

1.   For Delphi 6.55% Unsecured Notes due June 15, 2006 ($1,000 par value) purchased between the Offering Date and March 3, 2005, inclusive and:

    a.   Sold at a loss on or before the close of trading on September 30, 2005, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $998.75 per $1,000 Note and (b) the purchase price; less (ii) the sale price.

    b.   Sold at a loss between October 1, 2005 and October 16, 2006, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $998.75 per $1,000 Note and (b) the purchase price; less (ii) the greater of (a) $735.00 per $1,000 Note and (b) the sale price.

    c.   Held as of the close of business on October 16, 2006, an authorized claimant's Recognized Claim is "zero."

2.   For Delphi 6.5% Unsecured Notes due August 15, 2013 ($1,000 par value) purchased between the Offering Date and March 3, 2005, inclusive, and:

    a.   Sold at a loss on or before the close of trading on September 30, 2005, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $988.06 per $1,000 Note and (b) the purchase price; less (ii) the sale price.

    b.   Sold at a loss between October 1, 2005 and November 6, 2006, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $988.06 per $1,000 Note

and (b) the purchase price; less (ii) the greater of (a) $670.00 per $1,000 Note and (b) the sale price.

    c.    Held as of the close of business on November 6, 2006, an authorized claimant's Recognized Claim is "zero."

3.    For Delphi 8.25% Trust I Preferred Securities due October 15, 2033 ($25 par value) purchased between the Offering Date and March 3, 2005, inclusive, and:

    a.    Sold at a loss on or before the close of trading on April 11, 2005, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $25 per $25 Preferred Security and (b) the purchase price; less (ii) the sale price.

    b.    Sold at a loss between April 12, 2005 and November 13, 2006, an authorized claimant's Recognized Claim is (i) the less of (a) the offering price of $25 per $25 Preferred Security and (b) the purchase price; less (ii) the greater of (a) $16.85 per $25 Preferred Security and (b) the sale price.

    c.    Held as of the close of business on November 13, 2006, an authorized claimant's Recognized Claim is "zero."

4.    For Delphi Adjustable Rate Trust II Preferred Securities due November 15, 2033 ($1,000 par value) purchased between the Offering Date and March 3, 2005, inclusive, and:

    a.    Sold at a loss on or before the close of trading on September 30, 2005, an authorized claimant's Recognized Claim is (i) the lesser of (a) the offering price of $1,000 per $1,000 Preferred Security and (b) the purchase price; less (ii) the sale price.

    b.    Sold at a loss between October 1, 2005 and December 6, 2006, an authorized claimant's Recognized Claim is: (i) the lesser of (a) the offering price of $1,000 per $1,000 Preferred Security and (b) the purchase price; less (ii) the greater of (a) $300.00 per $1,000 Preferred Security and (b) the sale price.

c.    Held as of the close of business on December 6, 2006, an authorized claimant's Recognized Claim is "zero."

## IV.   THE ERISA SETTLEMENT AND PLAN OF ALLOCATION

The ERISA Settlement Stipulation -- entered into between the ERISA Lead Plaintiffs and Delphi Corporation, ASEC Manufacturing General Partnership, Delphi Mechatronic Systems, Inc., the Delphi Corporation Board of Directors' Executive Committee and its members, the Investment Policy Committee and its members, and Delphi Officer and Director Defendants J.T. Battenberg III, Robert H. Brust, Alan S. Dawes, Susan A. McLaughlin, and John D. Opie -- calls for a settlement and release of all claims against these Settled Defendants in exchange for $47,000,000 -- $22,500,000 to be paid in cash from available insurance policies, and an allowed interest in the face amount of $24,500,000 in the Delphi Bankruptcy action. As with the Securities Fraud Settlement, from this Gross Settlement amount, the costs of administration and the payment of attorneys' fees and costs will be deducted.[10] The Net Settlement Fund (referred to in the ERISA Settlement documents as the "Distribution Amount") will then

---

[10] Because of the continued pendency of Plaintiffs' claims against State Street Bank and the parties' agreement to withhold distribution of the settlement until after all of Plaintiffs' claims are resolved, instead of seeking an award of attorneys' fees and costs at this time, the ERISA Lead Plaintiffs' counsel requested that the Court simply reserve 25% from the Gross Settlement Fund for a potential award of both fees and costs which they will seek by way of a formal motion at the conclusion of the case. However, at the November 13, 2007 fairness hearing, the Court suggested an alternative -- that if a reserve is to be created that it be a reserve of 20% of the Gross Settlement Fund for fees and $750,000 (which is three times Lead Counsel's current out-of-pocket expenditures) for costs -- and counsel agreed that this was a reasonable alternative. As indicated, attorneys' fees are discussed in Section VII of this Opinion.

be allocated to the ERISA Class Members on a pro rata basis pursuant to a Plan of Allocation based upon each Class Member's proportionate loss from Plan investments in the Delphi and/or GM Stock funds.

The ERISA Plan of Allocation provides a formula for calculating each Class Member's share of the Distribution Amount. This formula first calls for the calculation of each Class Member's "Net Loss," which is the total of the Class Member's "Delphi Stock Net Loss" and "GM Stock Net Loss," as follows:

1. "Delphi Stock Net Loss" will be, for each Class Member = A+B-C-D, provided that if A+B-C-D is less than zero for a Class Member, such Class Member's Delphi Stock Net Loss will be zero.

> A = the dollar amount of the Class Member's account balance invested in the Delphi Stock Fund at the beginning of the Class Period.[11]
>
> B = the dollar amount added to the Class Member's Plan account balance invested in the Delphi Stock Fund during the Class Period.
>
> C = the dollar amount credited to the Class Member's Plan account balance resulting from dispositions from the Delphi Stock Fund during the Class Period.
>
> D = the dollar amount of the Class Member's account balance in the Delphi Stock Fund immediately after the end of the Class Period.

---

[11] The "Class Period" is defined in the ERISA Settlement Stipulation as "the period of time between May 28, 1999 and November 1, 2005, inclusive." The Plan of Allocation provides that if data is not available to determine the account balances of Class Members at the beginning or end of the Class Period, these calculations may be performed using data as of the nearest date prior to or after the beginning or end of the Class Period that is available.

2.  "GM Stock Net Loss" will be, for each Class Member = A +B-C-D, provided that if A+B-C-D is less than zero for a Class Member, such Class Member's GM Stock Net Loss will be zero.

> A = the dollar amount of the Class Member's Plan account balance invested in the GM Stock Fund at the beginning of the Class Period.

> B = the dollar amount added to the Class Member's Plan account balance invested in the GM Stock Fund during the Class Period.

> C = the dollar amount credited to the Class Member's Plan account balance resulting from dispositions from the GM Stock Fund during the Class Period.

> D = the dollar amount of the Class Member's account balance in the GM Stock Fund immediately after the end of the Class Period.

Pursuant to the Plan of Allocation, the Delphi Stock Net Losses and GM Stock Net Losses of the Class Members as calculated above will be then separately totaled to yield a Total Delphi Stock Net Loss and Total GM Stock Net Loss. Then, a "Preliminary Delphi Loss Fractional Share" and "Preliminary GM Loss Fractional Share" will be calculated for each Class Member.

A Class Member's "Preliminary Delphi Fractional Loss Share" is calculated by dividing each member's Delphi Stock Net Loss by the Total Delphi Stock Net Loss. Similarly, a Class Member's "Preliminary GM Fractional Loss Share" is calculated by dividing each member's GM Stock Net Loss by the Total GM Stock Net Loss. Using these Preliminary Fractional Loss Share figures, a "Preliminary Dollar Recovery" will

then be calculated by (i) multiplying the Class Member's Preliminary Delphi Loss Fractional Share by 80% of the Distribution Amount, (ii) multiplying the Class Member's Preliminary GM Loss Fractional Share by 20% of the Distribution Amount, and (iii) adding together these two sums. All Class Members whose Preliminary Dollar Recovery is less than $10.00 will receive an allocation of "zero," and that Preliminary Dollar Recovery will be reallocated proportionately among the other Class Members, and this Reallocation amount will be added to their Preliminary Dollar Recovery amounts to arrive at each Class Members' respective Final Dollar Recovery. These Final Dollar Recovery sums will, in turn, be deposited into the Class Members' respective retirement plan accounts in accordance with the existing election options for current contributions into the Plan then in effect.[12]

## V.  FINAL CERTIFICATION OF THE SETTLEMENT CLASSES

Fed. R. Civ. P. 23 sets forth the requirements for class certification.[13]  The Court

---

[12]  For Class Members who are former Plan participants or beneficiaries thereof, the Plan Administrator for each Plan will invest each Former Member's Final Dollar Recovery in a suitable short term investment vehicle.  The deposited amount, plus interest shall then, as soon as practicable, be distributed to the Former Member in the same manner as a qualified distribution from the Plan pursuant to ERISA and the Internal Revenue Code.

[13]  Fed. R. Civ. P. 23 provides, in pertinent part, as follows:

**(a)    Prerequisites to a Class Action**.  One or more members of a class may sue or be sued as representative parties on behalf of all on if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the

class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b)     Class Actions Maintainable**.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> **(1)** the prosecution of separate actions by or against individual members of the class would create a risk of
>
> > **(A)** inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> >
> > **(B)** adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impeded their ability to protect their interests; or
>
> **(2)** the party opposing the class has acted or refused to act on the grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> **(3)** the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense, of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

has already preliminarily certified both the ERISA and Securities Settlement classes.  The Plaintiffs now seek Final Certification of the classes for purposes of settlement.  The ERISA Plaintiffs seek Final Certification under Rule 23(b)(1) and/or(2), while the Securities Plaintiffs seek Final Certification under Rule 23(b)(3).

First, there is no question that the Rule 23(a) prerequisites of numerosity, commonality, typicality and adequacy prerequisites as to both settlement classes.

Rule 23(a)(1) requires that members of the class be so numerous that joinder of all would be "impracticable."  The Securities Class preliminarily certified by the Court is comprised of purchasers of Delphi Securities.  At the end of the Class Period, there were approximately 562 million shares of Delphi common stock and $1.5 billion of Delphi debt securities outstanding.  The Claims Administrator sent Notices to more than 442,000 potential Class Members or their nominees.  Given this magnitude, the Securities Fraud Class is unquestionably sufficiently numerous to satisfy Rule 23(a)(1).

The ERISA Class is similarly sufficiently numerous to render joinder of all members impracticable.  Here, the ERISA Class is comprised of approximately 45,780 current or former participants in one or more of the Delphi-sponsored employee benefit plans or their beneficiaries.

Rule 23(a)(2) is satisfied where there are "questions of law or fact common to the

_____

class." The requirement of commonality does not require that all questions of law or fact be common. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 518 (E.D. Mich. 2003). Instead, the requirement is only that there be at least <u>one</u> common question of law or fact. *See UAW v. Ford Motor Co.*, 2006 U.S.Dist. LEXIS 70471 at *53-54 (E.D. Mich. 2006), *aff'd by UAW v. GMC*, 497 F.3d 615 (6th Cir. 2007).

Federal securities cases easily satisfy the commonality requirement of Rule 23(a)(2). *See, e.g., In re Revco Sec. Litig.*, 142 F.R.D. 659, 661-62 (N.D. Ohio (1992). Here, the Securities Plaintiffs have asserted claims against the Settling Defendants for violations of the Exchange Act and/or the Securities Act. These claims present many questions of law and fact common to all members of the Class, including allegations that the Defendants violated the federal securities laws by making false and misleading statements which artificially inflated the market price of Delphi stock and that the Defendants acted with scienter.

Such commonality of questions of law and fact also exists with respect to the ERISA claims. The ERISA Plaintiffs' allegations that the Defendants breached the fiduciary duties they owed to members of the proposed class by imprudently offering and maintaining investment in the Delphi and/or GM Stock Fund as investment options under the Plans, and by imprudently allowing and/or directing the Plans to purchase and hold Delphi common stock satisfy Rule 23(a)(2).

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class." A plaintiff's claim is typical if it arises

from the same event or practice or course of conduct that gives rise to the claims of other

class members. *In re. Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Here, the

injuries to the Lead Plaintiffs and Class Members in both the Securities Fraud and ERISA

Classes are unquestionably attributable to the same acts or omissions of the Defendants

and liability for this conduct rests on the same legal theories.

Finally, the adequacy requirements of Rule 23(a)(4) are satisfied. In measuring

the adequacy of representation of the representative parties, the court must be assured that

the representatives have common interests with unnamed members of the class and it

must appear that the representatives will vigorously prosecute the interests of the class

through qualified counsel. *UA.W. v. GMC*, 497 F.3d at 626. To a large extent, the

adequacy requirement tends to merge with the commonality and typicality criteria of

Rule 23(a)(2) and (3). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997).

As set forth above, Lead Plaintiffs' interests and claims are common to and typical

of the classes they represent. They do not have any interests that are antagonistic to those

of the Class and the record reflects that they have pursued this litigation and the

settlement negotiations vigorously, sharing the common goal of maximizing recovery.

Thus, there is no conflict, intra-class or otherwise, that would defeat class certification.

*See Ford Motor Co.*, 2006 U.S.Dist. LEXIS 70741 at * 56 (recognizing that only a

conflict going to the very subject matter of the claims will defeat adequacy and there is

no conflict with class members "simply because the Settlement may impact individuals differently.")

For all of the foregoing reasons, the Court finds that the Rule 23(a) prerequisites to class certification are easily satisfied with respect to both the proposed Securities Fraud and ERISA classes.

Turning then to the particulars of Rule 23(b), as indicated, the ERISA Lead Plaintiffs seek class certification under Rule 23(b)(1) and/or (2) while the Securities Fraud Lead Plaintiffs seek certification under Rule 23(b)(3).

Under Rule 23(b)(1), a class may be certified if

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

> **(A)** inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

> **(B)** adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impeded their ability to protect their interests.

Rule 23(b)(1)(A) "considers possible prejudice to the defendants, while 23(b)(1)(B) looks to possible prejudice to the putative class members." *In re IKON Office Solutions Sec. Litig.*, 191 F.R.D. 457, 466 (E.D. Pa. 2000). Examined from either perspective, this subsection is satisfied here. Because of ERISA's distinctive

"representative capacity" and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a (b)(1) class action. *See Rankin v. Rots*, 220 F.R.D. 511, 521-23 (E.D. Mich. 2004).

A class may be certified under Rule 23(b)(2) if, in addition to meeting the requirements of Rule 23(a), "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Here, the ERISA Plaintiffs allege that Defendants breached their fiduciary duties by (among other things) failing to ensure that Delphi stock was a prudent investment for the Plans, and failing to properly monitor fiduciary appointees.

The available remedies under ERISA for such alleged misconduct include restoration of the Plans' losses, as well as such other equitable actions the Court finds appropriate. ERISA §§ 502(a)(2) & (3), 29 U.S.C. §§ 1132(a)(2) & (3); ERISA § 409(a), 29 U.S.C. § 1109(a). Indeed, remedies under § 502(a)(2) are by definition plan-wide, a classic example of equitable relief. *See e.g., Smith v. Provident Bank*, 170 F.3d 609, 616 (6th Cir. 1999) ("ERISA authorizes participants to sue on behalf of a plan for breach of fiduciary duty. . . . Permitting such suits by participants is the mechanism which Congress established to enforce the plan's right to recover for a breach of fiduciary duty.") Once the Plans recover through the relief available under ERISA, any consequential financial benefit to individual participants and beneficiaries "would flow

directly and incidentally" from the Plans' recovery. *Bublitz v. E.I. du Pont de Nemours & Co.*, 202 F.R.D. 251, 259 (S.D. Iowa 2001); *see also Berger v. Xerox Corp Ret. Income Guarantee Plan*, 338 F.3d 755, 763-64 (7th Cir. 2003 (certifying (b)(2) class where ERISA plaintiffs sought declaratory relief, and monetary relief would be the direct, anticipated consequence of the declaration.) Because the equitable relief issues would similarly predominate here, the Court finds that certification of the ERISA class would be proper under Rule 23(b)(2), as well as under Rule 23(b)(1).

Rule 23(b)(3), which the Securities Plaintiffs rely upon, authorizes class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "Common issues need only predominate, not outnumber individual issues." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 374-75 (N.D. Ohio 2001). Courts have repeatedly found that the Rule 23(b)(3) predominance test is "readily met" in securities fraud cases. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Kmart Corp. Sec. Litig.*, 1996 U.S. Dist. LEXIS 22609 at *30 (E.D. Mich. 1996). In determining whether common questions predominate, the Court's inquiry is directed toward the issue of liability. Where, as here, a single set of operative facts establishes liability and "a single proximate cause applies to each potential class member and defendant," class certification under (b)(3) is

appropriate. *Inter-Op*, 204 F.R.D. at 375. In sum, the Court concludes that the requisites for Rule 23(b)(3) certification of the Securities Fraud class are met.

For all of the foregoing reasons, the Court finds that the Fed. R. Civ. P. 23 requirements for class certification are met. Therefore, the Court will GRANT the ERISA and Securities Fraud Lead Plaintiffs' respective Motions for Final Class Certification.

VI.     THE SETTLEMENTS ARE FAIR, ADEQUATE AND REASONABLE

Pursuant to Fed. R. Civ. P. 23(e)(1)(A), a certified class action settlement requires court approval. In determining whether final settlement approval should be given to a proposed class settlement, the Court's role is to determine whether the terms proposed are "fair, adequate, and reasonable to those it affects" and "in the public interest." *Lessard v. City of Allen Park*, 372 F. Supp. 2d 1007, 1009 (E.D. Mich. 2005) (citing *Williams v. Vukovich*, 720 F.2d 909, 921-23 (6th Cir. 1983)); *Cardizem*, 218 F.R.D. at 522. In making this determination, the court considers whether the interests of the class as a whole are better served if the litigation is settled rather than pursued. *Id.* As the court observed in *UAW v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 70471, *supra*,

> In assessing the settlement, the Court must determine whether it falls within the range of reasonableness, not whether it is the most favorable possible result in the litigation. An appropriate range of reasonableness recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion. Under this standard, a just result is often no more than an arbitrary point between competing notions of reasonableness.

*Id.* at *58-61 (internal punctuation and citations omitted.)

Courts in the Sixth Circuit have found eight factors relevant in considering whether a class action settlement is fair, adequate, reasonable and consistent with the public interest. These factors are:

> (a) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest.

*Cardizem*, 218 F.R.D. at 522 (citing *Granada Investments, Inc. v. DWG Corp*, 962 F.2d 1203, 1205 (6th Cir. 1992), and *Willliams v. Vukovich*, 720 F.2d. 909, 922-23 (6th Cir. 1983)); *Rankin v. Rots*, 2006 U.S. Dist. LEXIS 45706 at *9-10 (E.D. Mich. 2006); *see also Ford Motor Co.*, *supra*, 2006 U.S. Dist. LEXIS 70471 at *62-63. "The court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Id.* "The district court enjoys wide discretion in assessing the weight and applicability of these factors." *Granada*, 962 F.2d at 1205-06. As discussed below, the Court finds that each of the Sixth Circuit's factors weighs in favor of approval of both of the Settlements.

    1.    Likelihood of Success on the Merits Weighed Against the
        <u>Amount and Form of the Relief Offered in the Settlement</u>

In evaluating a class action settlement, the court first weighs the plaintiffs'

likelihood of success on the merits against the amount and form of the relief offered by the settlement.   Here, Lead Plaintiffs in both the ERISA and Securities Fraud actions are optimistic about their ultimate success on the merits.  They believe strongly that the legal arguments advanced by the Settling Defendants in their motions to dismiss would fail and that the evidence would support their theories of liability and damages.  Defendants, of course, believe otherwise and Plaintiffs anticipate that Defendants would continue to advance their views forcefully through trial and appeal, if necessary.  Plaintiffs further acknowledge that Defendants are represented by highly experienced and competent counsel.  Accordingly, Plaintiffs acknowledge the risk that Defendants could prevail with respect to certain legal or factual issues, which could result in the reduction or elimination of Plaintiffs' potential recoveries.  Indeed, Plaintiffs admit that risk is inherent in any litigation, particularly class actions.  The risk is even more acute in the complex areas of ERISA law and the developing law under the PSLRA.  As a result, success is less than certain.

Juxtaposed against this background of uncertainty are two substantial settlements. The proposed Settlement in the Securities Fraud action will provide Class Members with a substantial recovery having a potential value of $284,100,000, which constitutes a large proportion of the losses suffered by the Class.  The Securities Fraud Lead Plaintiffs' damages expert opined that this represents 22% of the maximum damages.  Using Defendants' analyses, the Settlement represents at least 47% of the maximum damages.

Several noteworthy class action authorities have stated that the average securities fraud class action settles for between 3% and 15% of the damages suffered by the class. *See In re DPL Inc. Sec. Litig.*, 307 F. Supp. 2d 947, 951-52 (S.D. Ohio 2004) and authorities cited therein; *see also In re F&M Distrib., Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 11090 at *17 (E.D. Mich. 1999) (citing authorities estimating average recoveries at 7-11%, 12% and 25% of claimed losses).

To obtain such a solid settlement is a particularly excellent result in light of the significant risk to any ultimate recovery for the Securities Class created by Delphi's Bankruptcy Proceeding. Absent the Settlement, the Securities Fraud Class's recovery through Delphi's reorganization would itself be uncertain and the pendency of the Class's claims would delay Delphi's ultimate emergence from bankruptcy. This would negatively impact Delphi's ability to pay a sizeable distribution on any allowed claim belonging to the Class. Moreover, Lead Plaintiffs would likely be required to argue against the trial of their claims against Delphi in Bankruptcy Court, without a jury, through a summary estimation process which is designed to reduce liabilities of the debtor. Regarding the Individual Defendants, Lead Plaintiffs would face the risk that after a trial on the merits, a jury might award only a fraction of the Class's losses as damages and/or some of the Settling Defendants might be allocated only a small portion of the fault for those damages. Finally, indemnification claims by the Individual Defendants and the Underwriter Defendants asserted in Delphi's Bankruptcy Proceeding

would create additional issues that are resolved by the Settlement.

The ERISA Settlement is similarly fixed at a substantial amount -- approximately $47 million, consisting of $22,500,000 in cash and an allowed interest in the Delphi bankruptcy anticipated to have a value of approximately $24,500,000.  The amount Plaintiffs could recover if successful, discounted for risk, is clearly not certain.  Indeed, as the ERISA Lead Plaintiffs acknowledge, trials on the ERISA issues presented have been few and far between and the few decisions on summary judgment and adjudications on the merits in this area demonstrate the heavy burdens that Plaintiffs might ultimately have to face if the case were not resolved by settlement.

2.    The Risks, Expense and Delay of Further Litigation

In evaluating a proposed class settlement, the court also must weigh the risks, expense and delay the plaintiffs would face if they continued to prosecute the litigation through trial and appeal against the amount of recovery provided to the class in the proposed settlement.  *Cardizem, supra*, 218 F.R.D. at 523.  Courts have consistently held that the expense and possible duration of litigation are major factors to be considered in evaluating the reasonableness of a settlement.  *See e.g., In re Telectronics Pacing Sys., Inc.* 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001).  For class actions in particular, courts view settlement favorably because it "avoids the costs, delays and multitudes of other problems associated with them."  *Id.* at 1013.

If not for the Settlements, both the ERISA and the Securities Fraud actions would

have continued to be fiercely contested by all parties.  The Settling Defendants, most of whom are backed by numerous insurance policies and represented by well-respected and highly capable counsel, have demonstrated a commitment to defend the case through and beyond trial, if necessary.  The expense of continued litigation would be substantial.  The parties would have to complete lengthy, and extensive discovery involving reviewing and analyzing of thousands of additional documents, take depositions of dozens of witnesses across the country, and complete expensive expert discovery.  Any trial involving some or all of the Defendants would run at least several weeks, and involve numerous attorneys, witnesses and experts; the introduction of voluminous documentary and deposition evidence; vigorously contested motions; and the expenditure of enormous amounts of judicial and counsel resources.  Even if successful at trial, there most certainly would be appeals which would deny the Classes any recovery for years.  Avoiding such unnecessary expenditure of time and resources clearly benefits all parties and the Court.  *See Ford Motor Co., supra*, 2006 U.S. Dist. LEXIS 70741 at *70 ("The costs and uncertainty of lengthy and complex litigation weigh in favor of settlement.")

In sum, the proposed Settlements secure for both the ERISA and Securities Fraud Classes an immediate benefit, after approximately two years of litigation, undiminished by further expenses and without the delay, risk and uncertainty of continued litigation.

      3.      The Judgment of Experienced Counsel and the Amount and Character of Discovery

In deciding whether a proposed settlement warrants approval, "[t]he Court should

also consider the judgment of counsel and the presence of good faith bargaining between the contending parties." *Rankin v. Rots*, 2006 U.S. Dist. LEXIS 45706 at *9 (E.D. Mich. 2006). Both the ERISA and the Securities Fraud Lead Plaintiffs' Counsel have extensive experience in handling class action cases in their respective areas of practice, and they have thoroughly investigated and analyzed the claims alleged in these actions, and worked with experts in evaluating damages to the respective Classes and the financial wherewithal of Delphi. They have made informed judgments regarding the Settlements and believe that they are fair, reasonable and adequate.

In making their assessments, counsel relied in part on their investigations of the factual allegations, undertook substantial discovery efforts. They obtained hundreds of documents, including documents obtained through the bankruptcy proceeding and documents that Delphi and other Defendants produced to the SEC regarding Delphi's financial status and the alleged fraudulent financial transactions during the Class Period.

Additionally, the Court and the parties have had the added benefit of the insight and considerable talents of a former federal judge who is one of the most prominent and highly skilled mediators of complex actions, who acted as Special Master in the settlement negotiations.[14] Judge Phillips, based on his extensive involvement in the mediation of these actions, has expressed his view that the Settlements were reached at

---

[14] The Court particularly wishes to express its gratitude, no doubt shared by the parties, for the outstanding work done by Judge Phillips to achieve the result, which is in great part a measure of his prodigious efforts and skill.

arm's-length through hard-fought negotiations and that each of the Settlements represents

an excellent result given all of the facts and circumstances at issue.

5.       Whether the Settlements are Fair to Unnamed Class Members

The Court next considers whether the Settlements are fair to absent class

members.  This factor assesses whether the proposed settlements "appear[] to be the

result of arm's-length negotiations between the parties and fairly resolves all claims

which were, or could have been asserted."  *In re Rio Hair Naturalizer Prods. Liab. Litig.*,

1996 U.S. Dist. LEXIS 20440 at *42 (E.D. Mich. 1996).  As set forth above, the parties

reached the Settlement Agreements only after numerous and extensive mediation

sessions with Judge Phillips.  There is no question that the Settlements resulted from

arm's-length negotiations.

6.       Reaction of Class Members

In analyzing the Settlements, the Court also considers the Classes' reactions.

*Brotherton v. Cleveland*, 141 F. Supp. 894, 906 (S.D. Ohio 2001).  "A certain number of

opt-outs and objections are to be expected in a class action.  If only a small number [of

opt outs or objections] are received, that fact can be viewed as indicative of the adequacy

of the settlement."  *Cardizem*, 218 F.R.D. at 527 (citing *In re NASDAQ Market-Makers

Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998).

a.       Opt-Outs

The ERISA Class is a non-opt-out class.  However, the Order of Preliminary

Approval and the Notice of the Securities Fraud Settlement Agreement mailed to Class Members afforded those individuals who did not wish to participate in the settlement and who did not wish to be included in the class, the opportunity to opt out. The Order of Preliminary Approval stated that each "Request for Exclusion *must state*. . . the person's purchase and sales of Delphi Securities during the Class Period, including the dates, the number of securities purchased or sold, the price(s) paid or received per Delphi Security for each such purchase or sale, and whether such person continues to hod such Delphi Securities. . . ." (Order ¶ 21 (emphasis added)). The requirement to provide this information was repeated in the Notice mailed to Class Members, which stated, **in bold face type**, "[i]f you do not follow these procedures. . . you *will not* be excluded from the Class and you will be bound by all of the orders and judgments entered by the Court regarding the Settlement." (emphasis added).

Sixty-two exclusion requests were received. However, of those 62 requests, only **eight** provided the requisite information on purchase and sales of Delphi Securities. These properly submitted opt outs represent less than 5,100 shares of the approximately 562 million outstanding shares of Delphi stock. The other 54 purported exclusion requests omitted this information entirely. Many simply state, "I hereby wish to be excluded from the class," or words to that effect.

Upon the Court's inquiry at the fairness hearing, counsel for Delphi indicated that the company did not know, and could not find out, the number of shares held by each

such individual because most of Delphi's securities are held in "street name," i.e., in the name of the broker, bank or other nominee who purchased the stock on behalf of the beneficial owner, and the beneficial owner's name is not listed in the corporate books. These beneficial owners, therefore, are not known to any of the parties in this litigation. Furthermore, even if those who sought to opt out purchased some Delphi Securities in their own name, Delphi has no way of knowing how many shares they themselves purchased during the Class Period in "street name." Thus, the Class Members electing to exclude themselves are uniquely situated to provide such information.

This information is crucial because the Defendants need to know what they are facing. This Settlement included a "Supplemental Agreement," pursuant to which a Settling Defendant is permitted to terminate the Settlement if potential Class Members who purchased in the aggregate in excess of a certain amount of Delphi Securities during the Class Period (the "Opt-out Threshold") elected to opt out of the Settlement. Where, as here, a putative Class Member requests exclusion -- but does not identify his purchases of Delphi Securities -- the request for exclusion does not count against the Opt-out Threshold because the amount of securities the putative Class Member purchased is unknown. The requirement in the Court's Preliminary Approval Order was intended to insure that any putative Class Member who is going to excluded from the Class would have its purchase counted against the Opt-out Threshold so that the Settling Defendants could, if the Opt-out Threshold was reached, elect their right to terminate the Settlement.

The Court finds that the procedures for opting out from the class were plainly set forth in the Notice of Settlement and were not difficult to follow. Because the Settling Defendants had the right to terminate the Settlement if a certain percentage of the class opted out, they are entitled to know the number of the opt-outs. Accordingly, the Court declares that only those eight class members whose names are set forth in Exhibit A of the "Delphi Defendants' Objection to Form of Proposed Order of Final Judgment" [Dkt. # 294] are excluded from the Securities Settlement.

      b.    <u>Objections Raised by Class Members</u>

As noted above, if only a small number of objections to a class action settlement are received, that fact can be viewed as indicative of the adequacy of the settlement. *Cardizem*, 218 F.R.D. at 527; *see also Ford Motor Co.*, 2006 U.S.Dist. LEXIS 70471 at *78 (finding that 800 objectors out of 170,000 class members -- less than one half of one percent -- constituted a "very small level of opposition" which "is another reason to conclude that the Settlement is fair, reasonable, and adequate.")

In this case, as indicated above, the Claims Administrator mailed over 442,000 copies of the Notice of the Securities Fraud Settlement to potential Class Members. The Notice contained detailed instructions for submitting objections. No Securities Fraud Class Members filed any objections to class certification of the Action, the Settlement or to the Plan of Allocation. One potential Securities Class member, Michael J. Rinis, IRRA, f/b/o Michael J. Rinis ("Rinis") who purchased only 290 shares of stock did,

however, object to Lead Counsel's application for an award of attorneys' fees and

expenses.[15]

Mr. Rinis has filed objections as a class member in at least 15 class action

settlements and can be fairly characterized as a "serial objector." As indicated, Rinis

purchased only 290 shares of Delphi common stock during the Class Period (which

amounts to .0005% of the 562 million shares of stock outstanding at the end of the Class

Period). He does not dispute that class counsel has spent more than 40,000 hours on this

case. Nor does he dispute that 18% -- the percentage of the Gross Settlement sought by

Securities Lead Plaintiffs for their attorneys' fees -- is generally viewed as a reasonable

percentage for a fee award in class actions such as this one. However, Rinis states that

"when viewed in light of this type of litigation and the size of the fund," the Court should

find 18% unreasonable and, instead, allow fees only in the "5.5 to 9% range." He bases

this sum principally upon Alba Conte's "Attorney Fee Awards" treatise which states that

although the normal range of fee awards in class actions is 20-30%, "[d]eviations from

the normal range of percentage fees are appropriate when. . . the fund recovered is

extraordinarily large" and in a footnote, lists cases with recoveries of over $100 million

---

[15] One additional purported "objection" was filed by Independent Fiduciary
Services, Inc. ("IFS") on October 29, 2007, but this "objection" was actually a
"reservation of rights to later object" to requested attorneys fees and expenses. This
"objection" was filed before Lead Securities Plaintiffs' Counsel filed their formal
application for fees and expenses on November 6, 2007. IFS filed its objection to reserve
its rights to object to the fee application once it was filed if it determined the fee request
to be unreasonable. However, after reviewing the formally filed fee application, on
November 12th, IFS *withdrew* its objection.

that resulted in fee awards ranging from 5.5% to 9%.  *See* 1 Conte § 2.9, at pp. 128 and 130 n. 3.  (The other authority relied upon by Rinis is the Moshman Moore Study of Attorneys' Fees and the single page provided by Rinis shows an average 15.1% fee award in cases with recoveries greater than $100 million.)  The inconsistency of these studies/treatises shows why they should be viewed as having little, if any, relevance in determining the reasonableness of the fee award in this case.

As the Court observed on the record at the fairness hearing, although Mr. Rinis certainly has an interest in attempting to obtain a reduced award for the attorneys in order to increase his own recovery, the Court cannot disregard the fact that no other shareholders who received notice of the Securities Settlement lodged objections to the proposed fee application or any other aspect of the Settlement.  The touchstone for final approval is the effect on the class as a whole, in light of the circumstances.  *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)

With respect to the ERISA Settlement, there were six individuals who commented on the Settlement.  Three of those individuals -- Donald Egbert,  John J. Montecalvo, James Charles Spencer, all current or former Delphi Benefit Plan participants -- explicitly stated after discussing their concerns with counsel that they did not wish to object to the settlement.  Another Plan participant who did object, Steven Boyer, after discussions with counsel, withdrew his objection and authorized Lead Counsel to so inform the Court.  Pamela Geller, a non-class member, also filed an objection but she, too, later withdrew

her objection and directed her attorney to so inform the Court.

The only remaining objecting Plan participant out of the of approximately 45,780 current or former Delphi Benefit Plan participants comprising the ERISA Class is Randy Halazon of Vassar, Michigan. Mr. Halazon stated in his objection that he believes the settlement is "woefully underfunded." Mr. Halazon believes that a higher settlement is warranted in light of what he considers to be a "fraudulent" bankruptcy. Lead Counsel stated on the record that they had spoken with Mr. Halazon and explained the risks of proceeding to trial versus the substantial benefits of a settlement now, as well as the ongoing nature of the litigation against State Street. Counsel stated that Mr. Halazon appeared to understand these relative risks and the ongoing litigation, but nonetheless adheres his belief that he is entitled to a recovery greater than what he would be entitled to under the Settlement and wanted his opinion to remain on record.

The fact that there are no substantive objections to either the ERISA or the Securities Settlement is strong evidence that the Settlements are fair, adequate and reasonable and supported by the Class Members. *See Cardizem, supra; see also Rankin v. Rots, supra* (finding that the fact that notice of proposed Kmart class action settlement elicited objections from only approximately 0.002% of the class translated into "overwhelming[] support[]" of the settlement.)

6. <u>The Settlements are the Product of Arm's -Length Negotiations</u>

Another factor the Sixth Circuit has directed courts to consider in evaluating class

action settlements is whether the settlement is the product of arm's-length negotiations. Without evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreements were reached without collusion. *Telectronics,* 137 F. Supp. 2d at 1018 (citing Newberg on Class Actions § 11.51 (3d ed. 1992) ("Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.").) *See also Ford Motor Co.,* 2006 U.S. Dist. LEXIS 70471 at * 74-75; *Rio Hair*, 1996 U.S. Dist. LEXIS 20440 at * 43.

The Settlements in this case come after two years of litigation and extensive settlement negotiations between Lead Plaintiffs and the Settling Defendants in an intensive mediation process before Judge Phillips that consumed four weeks of negotiations. Indeed, Judge Phillips confirms in his Declaration that settlement negotiations were hard-fought, arm's-length, and not collusive.

 7. <u>The Public Interest Warrants Approval of the Settlements</u>

The final factor that the Court considers in evaluating a settlement is whether the settlement is consistent with the public interest. As this Court has previously recognized on the record, in light of the size of this case and the complexity and importance of Delphi's Bankruptcy Proceeding, approval of both the Securities and the ERISA Settlements serve the public interest.

The proposed Settlements conclude a significant portion of a high-profile, hotly

contested lawsuit involving allegations of massive fraud on the investing public and one that affects the retirement security of thousands of Delphi employees. No contravening public interest justifies deviating from the strong public interest in encouraging settlement of complex class action litigation. *See In re Cardizem, supra*, 218 F.R.D. at 534 ("[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Id.* (citation omitted).)

In addition, the Court is confident that the approval of these settlements will assist Delphi and its employees and shareholders in concluding its bankruptcy proceeding and returning to a more solid financial condition without the cloud of substantial litigation hanging over it.

In sum, having considered the complexity, expense, likely duration and risks of litigation, the state of the proceedings to date, the negotiations leading up to, and the ultimate terms of the Settlements, and all of the objections submitted, the Court has concluded that the proposed Securities and ERISA Settlements are fair and reasonable. Accordingly, the Court finds that both proposed Settlements merit FINAL APPROVAL.

VII.    THE APPLICATIONS FOR ATTORNEYS' FEES AND COSTS

Co-Lead Counsel for the Securities Class has filed an application for attorneys' fees and costs, seeking, as set forth in the Notice provided to the Securities class, as an award of attorneys' fees, 18% of the Gross Securities Settlement Fund, and an order

reimbursing them their litigation expenses up to $1,300,000. Court-appointed Special Master Judge Layn Phillips stated in his November 1, 2007 Declaration that he finds the fee award requested by the Securities counsel reasonable and appropriate. All four of the institutional Securities Lead Plaintiffs have also submitted declarations approving the fee request.

Co-Lead Counsel for the ERISA Class have not asked for an award of fees at present but instead have asked the Court to set aside a reserve of 25% of the Gross ERISA Settlement Fund for a potential award of attorneys' fees and expenses, inclusive. At the November 13, 2007 fairness hearing, however, the Court proposed instead that it create a reserve of 20% of Fund for fees and $750,000 for costs and ERISA Lead Counsel agreed on the record that they would not find the Court's proposal unreasonable.

A.      Lead Plaintiff's Counsel Are Entitled to a Reasonable Percentage of the Common Fund Recovered

"It is well established that 'a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" *Cardizem*, 218 F.R.D. at 531-32 (quoting *Boeing C. v. Van Gemert*, 444 U.S. 472, 478 (1980)). In common fund cases, the Sixth Circuit has held that "a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential-Bach Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). The standard for attorneys' fee awards in common fund cases is that they be "reasonable under the circumstances." *Id.*; *see also Cardizem*, 218

40

F.R.D. at 531; *Rio Hair*, 1996 U.S. Dist. LEXIS 20440 at *50.

Courts generally have discretion to apply either the percentage-of-the-fund or the lodestar method in calculating fee awards. *See Rawlings*, 9 F.3d at 516-17; *Cardizem*, 218 F.R.D. at 532. However, the Sixth Circuit has observed a "trend towards adoption of a percentage of the fund method in [common fund] cases." *Rawlings*, 9 F.R.D. at 515; *In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005); *see also* § 21D(a)(6) of the PSLRA, 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses award by the court to counsel for the plaintiff class shall not exceed *a reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class.") As the court observed in *Fournier v. PVS Invs.*, 997 F. Supp. 828 (E.D. Mich. 1998):

> The lodestar method should arguably be avoided in situations where such a common fund exists because it does not adequately acknowledge (1) the result achieved or (2) the special skill of the attorney(s) in obtaining that result. courts and commentators have been skeptical of applying the formula in common fund cases. . . . [M]any courts have strayed from using the lodestar in common fund cases and moved towards the percentage of the fund method which allows for a more accurate approximation of a reasonable award for fees.

*Id.* at 831-32 (citations omitted).

Here, the 18% and 20% fees requests appear to be more than reasonable. Indeed, when compared to the range of percentage fee awards generally accepted in this District, the amounts requested are below that range. *See e.g., Cardizem*, 218 F.R.D. at 532 (recognizing that fees of 20-30% are generally awarded in this Circuit); *F&M*, 1999 U.S. Dist. LEXIS 11090 at *19-20 (awarding 30% fee); *Rio Hair*, 1996 U.S. Dist. LEXIS

20440 at *56 (recognizing that the acceptable range of fee awards is 20% to 50% of the common fund); *In re Visteon Corp. ERISA Litig.*, No. 05-71205 (E.D. Mich., Mar. 9, 2007) (awarding 28% of $7.6 million settlement fund).

B.  Evaluation of the Fee Request of Securities Co-Lead Counsel under the Sixth
    <u>Circuit Factors Establishes the Reasonableness of the Requested Award</u>[16]

The Sixth Circuit has enumerated six factors for courts to use in evaluating the reasonableness of attorney fee requests: (1) the value of the benefit rendered to the class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.  *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983); *Cardizem*, 218 F.R.D. at 533; *Rio Hair*, 1996 U.S. Dist. LEXIS 20440 at *53.  Applying these factors confirms the reasonableness of the fee award requested by the Securities Co-Lead Counsel.

The primary factor in determining a reasonable fee is the result achieved on behalf of the class.  *In re DPL Inc. Sec. Litig.*, 307 F. Supp. 2d 947, 951 (S.D. Ohio 2004). Here, the recovery of potentially $284.1 million in value for the Securities Class represents a large proportion of the losses suffered by the Class.  As discussed above,

---

[16]  The Court will reserve its assessment of the reasonableness of fees of the ERISA Lead Counsel until a formal application for fees is filed at the conclusion of the case.  Accordingly, the discussion in this Opinion is limited to the reasonableness of the Securities Co-Lead Counsel's fee request.

using the approach to damages employed by Lead Plaintiffs' damages expert, the

Securities Settlement represents approximately 22% of the maximum damages. Certain

of the Settling Defendants have calculated the Settlement as representing at least 47% of

the maximum damages. This recovery surpasses the average range of recoveries

obtained in most securities fraud class actions. *See DPL, supra*, 307 F. Supp. 2d at 951-

52, and authorities cited therein (estimating average securities fraud recoveries at 7-11%,

12% and 25% of the claimed losses). The Settlement is even more impressive given the

impact of the Delphi Bankruptcy proceeding.

     In evaluating the reasonableness of a fee request, the court also must consider

society's stake in rewarding attorneys who produce a common benefit for class members

in order to maintain an incentive to others. *Cardizem*, 218 F.R.D. at 534 ("Encouraging

qualified counsel to bring inherently difficult and risky but beneficial class actions like

this benefits society."); *Rio Hair*, 1996 U.S.Dist. LEXIS 20440 at *54 ("[A]ttorneys who

take on class action matters enabling litigants to pool their claims provide a huge service

to the judicial process."); *Telectronics, supra*, 137 F. Supp. 2d at 1042-43 ("Attorneys

who take on class action matters serve a benefit to society and the judicial process by

enabling such small claimants to pool their claims and resources.")

     Whether counsel's services were undertaken on a contingent fee basis is another

factor for the Court to consider in evaluating a fee request. Co-Lead Counsel for the

Securities Class have prosecuted this action entirely on a contingent basis, knowing that

it possibly could last for four or five years, require the expenditure of thousands of attorney hours and millions of dollars in expenses and ultimately result in a loss at summary judgment or at trial. In fact, Co-Lead Counsel have incurred over $1.47 million in out-of-pocket expenses litigating for the benefit of the Securities Class, received no compensation during the more than two years this action has been pending, and were never guaranteed payment of any fee. Yet, as a result of Co-Lead Counsel's efforts, a significant recovery for the benefit of the Securities Class was obtained. This factor, like the first two factors, accordingly, weighs in favor of a finding of reasonableness of the fee request.

Courts in this Circuit also consider the complexity of the litigation in determining the reasonableness of an attorneys' fee award. While "most class actions are inherently complex," *Telectronics*, 137 F. Supp. 1s at 1013, this one presented a number of complicated legal, factual and procedural issues in multiple forums, including the Bankruptcy Court.

Finally, in considering fee requests, courts consider the professional skill and standing of counsel. *Cardizem*, 218 F.R.D. at 533. In this case, each of the Co-Lead Counsel has national standing and is among the most experienced securities lawyers in the country. Phillips Decl., ¶ 26. Co-Lead Counsel conducted extensive work with accounting and banking experts to evaluate the accounting issues in this case, damages to the Class, and Delphi's financial wherewithal. *See* Joint Declaration of Co-Lead

Counsel, ¶¶ 78-80.

The quality of opposing counsel also is important to evaluate. Here the Settling Defendants and their insurers are all represented by able counsel at some of the nation's most prestigious law firms. Phillips Decl., ¶ 26; Joint Decl., ¶¶ 111-112. The ability of Co-Lead Counsel to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested.

The Court is able to add that it had extensive interaction, both on-the-record and in chambers, with all Co-Lead Counsel, and has been considerably impressed, not only by counsel's skill, knowledge of the substantive and procedural law, and sophistication -- all of which were consistently evident to the Court -- but also by their dedication and commitment to their clients' cause. In short, these lawyers have practiced at the highest levels of professional competency, and the Court sees no reason not to award them the commensurately reasonable fee they have requested as it readily meets the criteria established by the Sixth Circuit.

C.    The Class's Support for the Fee Request Further Demonstrates Its Reasonableness

The Class's reaction to the requested fee award is also important evidence of the fairness and reasonableness of the fee request. *Cardizem*, 218 F.R.D. at 534. Here, over 442,000 Notices were mailed to potential Securities Class members. The Notices specifically stated that Co-Lead Counsel intended to apply for a fee of 18% of the Settlement Fund and reimbursement of costs and expenses in an amount not to exceed

$1.3 million.  As indicated above, only one objection was submitted on behalf of a serial objector who purchased only 290 shares of stock.  Given the substantial number of sophisticated institutional holders of Delphi Securities -- including the four Lead Securities Plaintiffs who have filed declarations supporting the fee request -- the existence of this one objection by a holder of comparatively few shares of stock is insignificant.  The Class's overwhelming favorable response lends further support to the conclusion that the requested fee award is fair and reasonable.

D.     Co-Lead Counsel Are Entitled to Reimbursement for Reasonable Litigation Expenses

"Expense awards are customary when litigants have created a common settlement fund for the benefit of a class."  *F&M*, 199 U.S. Dist. LEXIS 11090 at *20.  "Under the common fund doctrine, class counsel are entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses." *Cardizem,* 218 F.R.D. at 535.

Co-Lead Counsel seek reimbursement of costs and expenses in an aggregate amount of $1.3 million for prosecuting the settled claims on behalf of the Class.  As set forth in the Joint Declaration and Compendium of Counsel Declarations, these expenses were incurred on an ongoing basis for such items as accounting and damages expert and consultant fees, management and photocopying of documents, on-line research,

messenger service, postage, express mail and overnight delivery, long distance and facsimile expenses, transportation, meals, travel and other incidental expenses directly related to the prosecution of this action. Lead Plaintiffs approve Counsel's request. Moreover, no Class Member has objected to the request for reimbursement of expenses.

For all of the foregoing reasons, the Court will authorize an Award of Attorneys' Fees of 18% of the Gross Settlement Fund, to be paid in the same proportion of cash and Delphi Plan Currency received by the Class. The Court will also authorize an award of costs and expenses in the amount of $1.3 million.

Based upon the foregoing discussion, the Court will also set aside a reserve of 20% of the Gross ERISA Settlement Fund for an award of fees to the ERISA Co-Lead Counsel and will also reserve $750,000 for costs and expenses.

VIII.  DELPHI TRUST I'S INTERIM LEAD COUNSEL'S FEE REQUEST

Attorneys who were appointed as co-lead counsel by the Southern District of Florida court very early on in the *Bernstein* litigation (whose appointments the Court vacated in December 2006), referring to themselves as "Delphi Trust I Interim Lead Counsel" also filed, on November 2, 2007, a Motion for Fees and Costs asking that they be awarded fees and costs in the amount of $525,923.07 from the Securities Class Settlement Fund. Because of the untimeliness of their motion and because they have failed to sufficiently demonstrate that their activities provided any benefit to the Settlement Class that warrants an award of fees, their motion will be denied.

First, the PSLRA requires that any settlement class be afforded adequate notice of any request for attorneys' fees from a common fund created in a securities action. The statute provides, in pertinent part:

> Any proposed notice of final settlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements. . . .
>
> \* \* \*
>
> (C) If any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought. . . .

15 U.S.C. § 78u-4(a)(7)(C).

Lead Plaintiffs and Co-Lead Counsel presented the Court with a Motion for Preliminary Approval on August 31, 2007. That Motion specifically included a request to give the Class notice that Co-Lead Securities Counsel would seek attorneys' fees of up to 18% and reimbursement of expenses up to $1.3 million. A copy of the draft notice was attached to the Stipulation of Settlement. Although they were served with copies of Lead Plaintiffs' Motion and Stipulation of Settlement with the attached draft notice [*see* Notice of Electronic Filing of Document # 228 made at 3:38 p.m. EDT on 8/31/07], at no time thereafter did Delphi Trust I Interim Lead Counsel seek to intervene, or inform the Court in any way that they wished to give the Class notice that they, too, wanted the

48

Class to pay their attorneys' fees or reimburse them for their costs and expenses.

Five days later, on September 5, 2007, the Court preliminarily approved the Settlement and ordered that Lead Plaintiffs and Co-Lead Counsel issue notice to the Class. Still *Bernstein* counsel took no action. Nine days later, on September 14, 2007, Lead Plaintiffs and Co-Lead Counsel began disseminating to the Class the Court-ordered and PSLRA-mandated notice through mailings and publication of the "Notice of Proposed Settlement of Class Action With Certain Defendants, Motion for Attorneys' Fees and Reimbursement of Expenses and Fairness Hearing." The *Bernstein* Delphi Trust I Counsel still took no action to attempt to give the Class any indication of their intent to seek fees and costs.

Indeed, the October 29, 2007 deadline for requesting exclusion from the Settlement Class or to file an objection to the Notice, Settlement, Plan of Allocation or to Co-Lead Counsel's request for fees and costs came and went without any word from Delphi Trust I Interim Counsel or their client. No objection nor any statement of any kind was filed by or on behalf of Bernstein. Instead, Bernstein's counsel waited until November 2, 2007 -- <u>after</u> the deadline for filing objections had passed and only five business days before the scheduled fairness hearing -- to file their Motion for Fees and Costs. They never provided the Class Members any notice whatsoever -- much less reasonable, timely notice by publication or otherwise of their request for attorneys' fees. Therefore, no Class member could have even known about such a request by the October

29, 2007 deadline, and as such, the Class members never had an opportunity to object to it.

Fed. R. Civ. P. 23(h)(1) expressly provides, in pertinent part: "Notice of [a] motion [for an award of attorney fees] must be served on all parties, and for motions by class counsel, directed to class members in a reasonable manner." *See also* 15 U.S.C. § 78u-4(a)(7)(C). Delphi Trust I Interim Lead Counsel failed to even attempt to comply with these rules. This failure deprived the Class of its right to object to the Delphi Trust I Counsel's fee application. *See* Fed. R. Civ. P. 23(h)(2) ("A class member, or a party from whom payment is sought, may object to the motion.")

Because Interim Lead Counsel for Delphi Trust I failed to intervene prior to the dissemination of Notice or otherwise timely notified the Class Members or anyone else of their intent to file a fee and expense request, the Court finds that they have waived their right to any such request under Rule 23(h) and the PSLRA.

However, even if lack of notice to the Class did not persuade the Court to deny Bernstein's counsel's fee request, the Court finds that the activities of Delphi Trust I Interim Counsel did not create a benefit for the Class.

Bernstein's counsel claim that they created a benefit for the Class by initiating the action on behalf of the Delphi Trust I certificate purchasers asserting claims under Section 11 and 15 of the Securities Act and maintain that if they had not filed their complaint in Florida, the Delphi Trust I subclass "might have fallen through the cracks,

not been represented and not received any part of the settlement negotiated by the Lead Counsel." *See* "Supplemental Memorandum Describing Benefits Conferred by Interim Lead Counsel in the Bernstein Action," p. 2. This argument, they posit, is "a position based on a strong inference from the record facts and chronology of this litigation." *Id.* Speculation and inference, however, are not a basis for awarding attorneys' fees.

The Court should also note that a very substantial portion of fees requested related to time spent attempting to be appointed as co-lead counsel by this Court, and importantly, was expended after the Florida court, which had initially appointed them interim counsel, had stayed the Florida action pending MDL transfer. When the Court inquired about this at the fairness hearing, and whether counsel did not assume the risk of not being compensated for this time, particularly in view of the Florida court's stay order, counsel had no substantive response.

Bernstein's counsel point to no other actions taken by them during the course of this more than two-year litigation -- other than the original filing of the Florida complaint -- which they claim created or conferred any benefit upon the Class.[17] This "first to file" argument is one which this Court has already rejected in vacating the Florida court's order appointing Bernstein's attorneys as lead counsel. Simply stated, merely having initiated an action under the PSLRA entitles Bernstein Interim Lead

_____

[17] Although they point to no other actions taken by them other than the filing of the complaint which conferred any benefit on the Class, most of the fees the Bernstein Interim Lead Counsel seek are for all of their various actions taken *after* filing their complaint.

Counsel to nothing.

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the ERISA Plaintiffs' Motion [Dkt. # 266] for Final Approval of ERISA Class Action Settlement, for Certification of Settlement Class, for Reserve from the Gross Settlement Fund for Potential Award of Attorneys' Fees and Expenses, for Case Contribution Awards to Named Plaintiffs and for a Plan of Allocation is GRANTED. Accordingly,

IT IS FURTHER ORDERED that the ERISA Settlement Class is hereby certified as a non-opt out class pursuant to Fed. R. Civ. P. 23(b)(1) and (2).

IT IS FURTHER ORDERED that the ERISA Class Action Settlement is APPROVED by the Court pursuant to Fed. R. Civ. P. 23(e).

IT IS FURTHER ORDERED that 20% of the Gross Settlement Fund for a potential award of attorneys' fees and $750,000 for costs and expenses be reserved from the Gross Settlement Fund pending resolution of all claims in the ERISA action and the filing by ERISA Co-Lead Counsel of a formal application for fees and expenses.

IT IS FURTHER ORDERED that the proposed payment of Case Contribution Awards to the six Named Plaintiffs for their active assistance in prosecuting this matter in the amount of $5,000.00 each is hereby APPROVED by the Court.

IT IS FURTHER ORDERED that the proposed ERISA Settlement Plan of

Allocation is APPROVED.

IT IS FURTHER ORDERED that the Securities Lead Plaintiffs' Motion [Dkt. # 273] for (I) Certification of the Class for Settlement Purposes, (II) Final Approval of Settlement, and (III) Final Approval of Plan of Allocation is GRANTED. Accordingly,

IT IS FURTHER ORDERED that the Securities Settlement Class is hereby certified pursuant to Fed. R. Civ. P. 23(b)(3).

IT IS FURTHER ORDERED that only the eight individuals/entities identified in Exhibit A to Delphi's Objection to Form Proposed Order and Final Judgment [Dkt. # 294] are excluded from the Securities Settlement Class.

IT IS FURTHER ORDERED that the Securities Class Action Settlement is APPROVED by the Court pursuant to Fed. R. Civ. P. 23(e).

IT IS FURTHER ORDERED that the proposed Securities Settlement Plan of Allocation is APPROVED.

IT IS FURTHER ORDERED that Securities Co-Lead Counsel's Motion [Dkt. # 275] for Award of Attorneys' Fees and Reimbursement of Expenses is GRANTED. Accordingly,

Securities Class Co-Lead Counsel are hereby awarded 18% of the Gross Settlement Fund for attorneys' fees and $1,300,000 for costs and litigation expenses.

IT IS FURTHER ORDERED that the Motion of Delphi Trust I Interim Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses [Dkt. # 264] is

DENIED.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  January 11, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 11, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager